IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

        Plaintiff,

v.

DEAN M. YOUNGQUIST,

        Defendant.

3:11-cv-06113-PK

FINDINGS AND RECOMMENDATION

PAPAK, Judge:

Plaintiff United States of America moves for summary judgment (#57) against Defendant Dean Youngquist ("Youngquist") to: (1) reduce his federal income tax assessment for the 1996 tax year to judgment; (2) foreclose the United States' liens against real property commonly known as 428 NW Ninth Street, Corvallis, Oregon ("Subject Property"); and (3) sell the Subject Property to partially satisfy Youngquist's federal income tax liability for the 1996 tax

Page 1 - FINDINGS AND RECOMMENDATION

year. Also pending is Youngquist's Motion to Strike Exhibit 9 (#61). For the reasons discussed below, the motion for summary judgment should be granted, and the motion to strike should be denied.

## BACKGROUND

### I. Tax Year 1996

This case involves Youngquist's tax liability for tax year 1996. Youngquist did not file a tax return for 1996, and he has not filed a valid tax return since the late 1980s.

In 1996, Youngquist began day trading. He testifies that he opened an account with a brokerage called Protrade in November of 1996, made trades through that account, and then closed the account in December 1996. After closing his Protrade account, Youngquist began trading through a second brokerage called Datek.

Through his deposition testimony, answers to interrogatories, and requests for admissions, Youngquist agrees that in 1996 he sold a total of $1,451,076 in stock through his Protrade account. (#59, Harrington Decl. Ex. 1 at 130:23-131:6; Ex. 2 at p. 3.) He also agrees that he sold $601,612.50 in stock through the Datek account in 1996. (Id.) More specifically, Youngquist agrees that the following is an accurate list of the stock sales he made through his Protrade[1] and Datek accounts in 1996:

| Computer Clearing Services Inc. | $14,712 |
|---|---|
| " | 11,563 |
| " | 23,188 |
| " | 13,088 |
| " | 140,483 |

---

[1] Youngquist testified that his "Protrade sales are listed as Computer Clearing Services, Inc." (Youngquist Dep. 131:5-6.)

Page 2 - FINDINGS AND RECOMMENDATION

| | |
|---|---:|
| " | 146,238 |
| " | 12,887 |
| " | 37,113 |
| " | 144,883 |
| " | 145,183 |
| " | 146,383 |
| " | 152,382 |
| " | 292,778 |
| " | 26,113 |
| " | 6,437 |
| " | 14,588 |
| " | 25,056 |
| " | 59,363 |
| " | 24,713 |
| " | 13,925 |
| Datek Securities Corp | 14,800 |
| " | 29,500 |
| " | 29,687 |
| " | 14,990 |
| " | 36,500 |
| " | 37,000 |
| " | 55,750 |
| " | 58,990 |
| " | 59,000 |
| " | 59,740 |
| " | 59,750 |
| " | 145,865 |
| Total | $2,052,648 |

(#59, Harrington Decl. Ex. 1 at 130:23-131:6; Ex. 2 at p. 3; Ex. 9.)

It is undisputed that in tax year 1996 Youngquist earned: (1) interest or dividends in the amount of $151.00 in The Reserve Fund Account; (2) interest of $51.42 in the Datek Account; and (3) interest in the amount of $758.93 in a Washington Federal Savings Account.[2] (#59, Harrington Decl. Ex. 2 at p. 3.)

---

[2] It is also undisputed that in 1996 Youngquist earned income from the sale of computer memory chips. The United States is not seeking to amend its assessment at this point to include income from these sales.

Page 3 - FINDINGS AND RECOMMENDATION

## II. IRS Notices, Assessments and Liens

As mentioned above, Youngquist did not file a tax return for tax year 1996. On February 23 and April 20, 1998, the IRS sent Taxpayer Delinquency Notices to Youngquist. Youngquist does not recall whether or not he received these notices. On November 1, 2000, in accordance with 26 U.S.C. § 6212, the IRS sent a Statutory Notice of Deficiency to Youngquist which gave him 90 days to petition the Tax Court. Youngquist does not recall whether or not he received the Statutory Notice of Deficiency, but it is undisputed that he did not petition the Tax Court and the 90 day petition period lapsed.

On April 9, 2001, the IRS made a tax assessment against Youngquist. The IRS assigned a cost basis of zero to his 1996 stock sales. As a result of his stock sales and interest/dividend income, an individual income tax of $791,200 was assessed against Youngquist based on an adjusted gross income of $2,053,557, and a taxable income of $2,049,557. (#59, Harrington Decl. Ex. 3.) The following penalties and interest were also assessed against Youngquist on April 9, 2001: (1) $42,112.41 estimated tax penalty; (2) $178,020.00 late filing penalty; (3) $386,706.57 interest assessment; and (4) $189,888.00 failure to pay tax penalty. (Id.)

In December 2001, the IRS filed a Notice of Federal Tax Lien against Youngquist with the Oregon Secretary of State and with Benton County.[3] (#59, Harrington Decl. Ex. 4; Ex. 5.) Both Notices of Federal Tax Lien listed Youngquist's residence as 428 NW 9th St., Corvallis, OR. On December 11, 2001, the IRS sent a letter via certified mail to Youngquist's above-listed address to notify him a Notice of Federal Tax Lien had been filed in the amount of

---

[3] Both Notices of Federal Tax Lien were refiled in December 2010. (#59, Harrington Decl. Ex. 6.)

Page 4 - FINDINGS AND RECOMMENDATION

$1,587,926.98. (#59, Harrington Decl. Ex. 7.) Youngquist generally does not recall whether he received any notices, and he does not recall when he learned of his tax liability. With respect to the December 11, 2001 letter, Youngquist testified as follows:

> Q: Do you have any reason to think that you did not receive this letter?
>
> A: I - - I don't have any reason to think I didn't, other than I didn't think that they - - I remember updating my address in 2005, and I thought that there had been a problem with my address not being current with the IRS at that time, so - - hmm. It's certainly possible I received it.

(#59, Harrington Decl. Ex. 1 at 53:11-24.)

### III. Youngquist's Claimed Basis in Sales of Stock Through Datek and Protrade

On March 31, 2010, the United States instituted this action to reduce Youngquist's tax assessments to judgment, to foreclose its liens, and to sell Youngquist's property and distribute the proceeds from the sale to satisfy lienholders. During the course of this proceeding, Youngquist has been able to provide some evidence of his cost basis in stock sold in 1996.

#### A. Youngquist's Evidence of Cost Basis in Stock Sold in Datek Account

Youngquist has been able to produce multiple emails dating back to December 1996 which reveal the details of specific transactions he executed through his Datek account. (#59, Harrington Decl. Ex. 13.) Even better, Youngquist produced a single page summary of every purchase of stock, and every sale of stock he made through his Datek account. (Id. at Ex. 10 (the "Datek Transaction History").) The Datek Transaction History lists: (1) the date and execution time for each buy or sell transaction Youngquist made in December 1996; (2) the quantity of shares of stock bought or sold in each transaction; (3) the name of the stock bought or sold; (4) the price at which each share of stock was bought or sold; and (5) the net change and account balance after each purchase or sale. (Id.)

Page 5 - FINDINGS AND RECOMMENDATION

The Datek Transaction History reveals Youngquist sold stock through twelve separate transactions in 1996. Each separate stock sale transaction listed on the Datek Transaction History matches up with one of the twelve entries listed under the Datek Securities Corp heading of the table detailed above. (See, #59, Harrington Decl. Ex. 9 at Ex. A.) More importantly, for each separate stock sale transaction listed on the Datek Transaction History, there is a corresponding stock purchase transaction.

Youngquist testified that he opened the Datek account on December 26, 1996 with a check for $78,000 drawn on his Washington Federal Savings Account. (#64, Youngquist Decl. at ¶ 9.) On December 30, 1996, Youngquist made three separate purchase transactions for stock with a ticker symbol ZITL. The combined cost of those three transactions was $158,359.99. The next day, ZITL's stock price tanked and Youngquist's leverage was exposed. His Datek account balance plummeted to -$69,060.98. (#59, Harrington Decl. Ex. 10.)

It turns out Datek had not yet negotiated Youngquist's December 26, 1996 check for $78,000. So, Youngquist simply closed his Washington Federal Savings account and left Datek with the loss. (#64, Youngquist Decl. at ¶¶ 9-10.)

**B. Youngquist's Evidence of Cost Basis in Stock Sold in Protrade Account**

Youngquist has been unable to produce any documentation regarding his Protrade brokerage account. He testifies that he "has searched high and low in my home for any ProTrade documents. I have not found any." (#64, Youngquist Decl. at ¶ 6.) He goes on to state that he began looking for Protrade records in 2004 or 2005, but discovered Protrade was out of business. (Id. at ¶ 7.) In an interrogatory response, Youngquist offered that if the Protrade "records exist, they may be at Penson Financial Services, Inc." (#59, Harrington Decl. Ex. 2 at p. 3.) The

United States issued a subpoena to Penson Financial Services which did not have any responsive documents. (Id. Ex. 11 at p. 5.)

According to Youngquist, he opened the Protrade account on November 5, 1996 by transferring $73,000 from his Washington Federal Savings[4] account to Protrade. (#64, Youngquist Decl. at ¶ 2.) According to Youngquist, he closed the Protrade account on or about December 20, 1996. (Id. at ¶ 5.) At that time he withdrew the remaining balance of $67,332.66 from Protrade and deposited that amount back into the Washington Federal Savings account. (Id.) Youngquist obtained these numbers from withdrawal and deposit records of his Washington Federal Savings account. (See, #63, Hoevet Decl. Ex. 108; #64 Youngquist Decl. Ex. 100.) The Washington Federal Savings account records show a November 5, 1996 withdrawal in the amount of $73,000 and a December 20, 1996 deposit in the amount of $67,332.66. The bank account records do not reveal to whom the $73,000 was paid or from whom the $67,332.66 withdrawal came.

## IV. The Subject Property[5]

The Subject Property upon which the United States seeks to foreclose its liens is located at 428 NW Ninth St., Corvallis, Oregon, and its legal descriptions is as follows:

> A tract of land situated in the City of Corvallis, County of Benton and State of Oregon more particularly described as follows: Beginning at a point on the West

---

[4] In the summary judgment record this account has been variously referred to as the "Washington Federal Savings" account, the "Western Federal Savings" account, and the "Willamette Federal Savings" account.

[5] In his declaration, Youngquist details the squalid condition of the Subject Property. (#64 at ¶ 15.) His lawyer submitted a declaration also attesting to the poor condition of the Subject Property and describing Youngquist as a hoarder. (#63 at ¶ 1.) Neither the current condition of the Subject Property nor Youngquist's current living conditions are relevant to the analysis of Youngquist's 1996 tax liability.

Page 7 - FINDINGS AND RECOMMENDATION

Line of 9th Street, 150 feet Northerly from the intersection of the West Line of 9th Street and the North Line of Harrison Street, in the City of Corvallis, Benton County, Oregon, and Running thence Northerly along the West line of 9th Street 56 feet; thence Westerly parallel with the North line of Harrison Street 127.60 feet; thence Southerly parallel with the West line of 9th Street 56 feet; thence Easterly 127.60 feet to the point of beginning.

Youngquist is the sole owner of the Subject Property, and all other parties' interests in the Subject Property have been resolved. Default judgments have been entered against defendants Gene Head and the Oregon Department of Revenue. (#47, #48.) The United States and Benton County have entered into a stipulation resolving their claims. (#13.)

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). When considering a motion for summary judgment, the district court's role is not to weigh the evidence, but merely to determine whether there is a genuine issue for trial. *Liberty Lobby*, 477 U.S. at 249; *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Only after the moving party has made such a showing does the burden shift to the opposing party to show that a genuine issue of fact remains. *See* Fed. R. Civ. P. 56(e).

Page 8 - FINDINGS AND RECOMMENDATION

To establish the existence of a genuine issue of material fact, the non-moving party must make an adequate showing as to each element of the claim on which the non-moving party will bear the burden of proof at trial. *See Celotex,* 477 U.S. at 322-23; *see also Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989). The opposing party may not rest on conclusory allegations or mere assertions, *see Taylor,* 880 F.2d at 1045; *Leer v. Murphy,* 844 F.2d 628, 631 (9th Cir. 1988), but must come forward with significant probative evidence, *see Liberty Lobby,* 477 U.S. at 249-50; *Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir. 1989). The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Taylor,* 880 F.2d at 1045.

## DISCUSSION

### I. Motion to Strike Plaintiff's Exhibit #9

Plaintiff's Exhibit 9 is a February 1, 2006 letter from the Oregon Department of Revenue to Youngquist. (#59, Harrington Decl. Ex. 9.) The letter explains that Youngquist's Oregon income tax return is being reviewed and additional information is needed. Specifically, the Oregon Department of Revenue requests information related to 1996 stock and bond sales that were reported to the IRS in the amount of $2,052,648. Exhibit A to the letter is titled "Stock and Bond Sales Reported to the IRS – 1996," and it names Dean Youngquist alongside his social security number. Below the title, Exhibit A presents a list of thirty-two dollar figures under the headings of Computer Clearing Services, Inc., and Datek Securities Corp., and it adds each dollar figure to reach a total of $2,052,648. This is the list detailed in the Background section, above.

Youngquist moves to strike Exhibit 9 from the summary judgment record. Youngquist's objections are that Exhibit 9 is inadmissible because: (1) it has not been properly authenticated

Page 9 - FINDINGS AND RECOMMENDATION

pursuant to Fed. R. Evid. 602; (2) it is hearsay that does not fall within an exception; and (3) Exhibit A (Attached to Exhibit 9) is an impermissible summary under Fed. R. Evid. 1006 because the underlying documents were not made available to Mr. Youngquist for inspection.

In his deposition, Youngquist testified as follows[6]:

Q. You have just been handed Exhibit No. 13 which is a document Bates stamped No. YOUNG000022, and it's a letter from the Oregon Department of Revenue. Do you recognize this letter?

A. Yes.

Q. So what is this letter?

A. Yeah. This is a letter from one of the Oregon Department of Revenue auditors to me.

. . . .

Q. Did you have any other correspondence from the Oregon Department of Revenue concerning the 1996 tax year?

A. I don't know. But I do - - I do remember I actually got two or three copies of this letter . . .

Q. So turning to YOUNG0000024, which is, I believe, the last page, there's stock and bond sales reported to the IRS in 1996.

A. Yes.

Q. So these are for reports of all the sales you made, with Protrade being the first one and Datek being the second one?

A. Yea, that's correct. Protrade sales are listed as Computer Clearing Services.

(#66, Ex. 18 at 127:13-20; 130:9-131:6.)

---

[6] Plaintiff's Exhibit 9 was labeled Exhibit 13 in the deposition, with Bates stamp YOUNG000022 representing the first page, and Bates stamp YOUNG000024 representing what is referred to herein as Exhibit A.

Page 10 - FINDINGS AND RECOMMENDATION

Exhibit 9 has been properly authenticated. Youngquist himself authenticated Exhibit 9 by testifying in his deposition that he recognized the letter, and that he received the letter from the Oregon Department of Revenue. Fed. R. Evid. 901 (the item is what the proponent purports it to be as proved by testimony of a witness with knowledge).

Exhibit 9 is not hearsay. The definition of hearsay specifically excludes statements offered against an opposing party when the offered statement is "one the party manifested that it adopted or believed to be true." Fed. R. Evid. 801(d)(2)(B). Youngquist testified that Exhibit 9, and specifically Exhibit A, was a report of all the sales he made through his Protrade and Datek accounts. He did not deny or dispute the numbers, and he admits to relying on Exhibit 9 to estimate his basis in stock sales. (#66, Ex. 18 at 18:12-24.) Exhibit 9 is also offered for the nonhearsay purpose of establishing what the IRS relied upon in making the tax assessment against Youngquist. *See Ferguson v. United States*, 484 F.3d 1068, 1074 (8th Cir. 2007) (spreadsheet admitted not for purpose of proving figures were accurate, but to show what IRS relied on in making assessment). Finally, Fed. R. Evid. 1006 does not apply. Exhibit 9 is not purported to be a summary of voluminous content under Fed. R. Evid. 1006. Youngquist has adopted the contents of Exhibit 9 as an accurate record of his sales of stock in 1996, and in any event the underlying documentation for Exhibit 9 has been lost by Youngquist himself. Youngquist's Motion to Strike Exhibit 9 is denied.

## II. Challenges to the Tax Assessment

### A. Presumption of Correctness

The United States may reduce its tax assessment to judgment by filing suit under 26 U.S.C. §§ 7401 & 7402. In this action to collect taxes, the United States has the initial burden of proof. *Palmer v. I.R.S.*, 116 F.3d 1309, 1312 (9th Cir. 1997). In meeting that burden the

Page 11 - FINDINGS AND RECOMMENDATION

"Commissioner's deficiency determinations and assessments for unpaid taxes are normally entitled to a presumption of correctness so long as they are supported by a minimal factual foundation." *Id.* Where the government offers a "naked assertion" of unreported income without factual foundation, "an assessment may not be supported even where the taxpayer is silent." *Weimerskirch v. CIR*, 596 F.2d 358, 360-61 (9th Cir. 1979) (*quoting Gerardo v. CIR*, 522 F.2d 549, 552 (3rd Cir. 1977)).

Youngquist contends that the United States should not be able to rely upon Youngquist's testimony and admissions in order to meet its initial burden of proof. He argues that the United States "would have been stuck with a naked assessment had Youngquist remained silent and not clothed the assessment with his admissions." However, Youngquist did not remain silent. He testified that he had stock sales in tax year 1996, and he testified that Plaintiff's Exhibit 9 accurately reflects each stock sale transaction he made in 1996. Youngquist does not quarrel with the underlying factual basis for the assessment – that is, that the numbers were derived from Form 1099s submitted to the IRS by Protrade and Datek and that the numbers are accurate. What he disputes is assigning a cost basis of zero to the stocks sold. Based on this information, I conclude the United States has met its initial burden of proof by submitting evidence that Youngquist derived income from the sale of stock in 1996.

### B. Cost Basis in Stock

Youngquist's basis in the stock he sold is determined by the amount he paid to purchase those stocks. See, 26 U.S.C. § 1012 ("The basis of property shall be the cost of such property.") It is the taxpayer's burden to establish that they have a basis in property. *Coloman v. Comm'r*, 540 F.2d 427, 429 (9th Cir. 1976). "The fact that basis may be difficult to establish does not relieve a taxpayer from his burden." *Id.* at 430. If the taxpayer fails to satisfy the burden, the

Page 12 - FINDINGS AND RECOMMENDATION

basis is deemed to be zero. *Id.* at 431. Where it is clear that some amount has been paid for property, but it is not possible to determine the amount "with exactitude," then it may not be appropriate to declare the basis to be zero. *Cohan v. Comm'r*, 39 F.2d 540, 544 (2nd Cir. 1930). However, in order to apply the rationale of *Cohan*, there must be sufficient evidence to make an estimation, and "[s]elf-serving, vague, and undocumented testimony is insufficient." *Williams v. Comm'r*, 1994 WL 50462, 67 T.C.M. (CCH) 2185, T.C.M. (RIA) 94,063 (U.S. Tax Ct. 1994).

### 1. Datek

The United States concedes that Youngquist has met his burden of proof in substantiating his basis in stock sold through Datek. The Datek Transaction History details each purchase date, the number of shares purchased, the name of each stock purchase and the per share price. Each purchase transaction also corresponds precisely with a subsequent stock sale transaction. The United States will abate the assessments by the portion of the assessments, penalties, and interest that were based upon the $601,612.50 in stock sales through Datek in 1996.

### 2. Protrade

In contrast to the detailed documentary evidence related to the Datek trading account, there is no evidence documenting Youngquist's actual stock transactions in the Protrade account. There are no statements from Protrade. There are no letters or emails from Protrade. Youngquist did not keep any notes about the stocks he purchased and sold, and he is unable to testify from memory about the specific stocks he bought and sold.

Instead, Youngquist would like to rely upon aggregate numbers to deduce what his overall basis was for the series of stock trades he made. In other words, Youngquist's position is that he withdrew $73,000 from his bank account on November 5, 1996, and deposited $67,332.66 back into in his bank account on December 20, 1996. From this information,

Page 13 - FINDINGS AND RECOMMENDATION

Youngquist concludes he started his Protrade account with $73,000, and he ended the account with $67,332.66, so he had an aggregate loss of $5,677.34 in trading within the Protrade account. When compared with the $1,456,076 in aggregate gross income attributed to stock sales reported by Protrade, Youngquist can deduce that his aggregate basis in the stocks must have been $5,677.34 less, or $1,450,398.66.

There are two problems with Youngquist's argument. First, I can find no authority to support his aggregate theory of proving basis in stock. Here, we have twenty stock sale transactions. Each stock sale is an independent sale of specific property. Each stock sale has a corresponding specific purchase price and purchase date. There is a gain or loss associated with each sale of a particular stock. Lining these facts up with some particularity is important and can have significant consequences. For example, knowing a particular stock's purchase date is required for establishing whether to treat a gain or loss as short-term or long-term. If a nonmoving party's evidence is merely colorable or is not sufficiently probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. Under these circumstances, Youngquist's novel aggregate basis theory based on vague bank records is not sufficiently probative evidence of his cost basis in specific stock sold through his Protrade account.

Even if the aggregate cost basis theory were viable, Youngquist has a second problem. His only evidence is his own uncorroborated testimony. Youngquist's bank account records do not reveal the November 5, 1996 withdrawal went to Protrade. There is no wire transfer record. There is no canceled check evidencing payment to Protrade. Youngquist relies solely on his own testimony to suggest these facts. Likewise, there is no evidence other than Youngquist's own testimony that the deposit on December 20, 1996 was from Protrade. And these facts are still at least one step removed from being evidence that any of those funds were used to purchase any of

Page 14 - FINDINGS AND RECOMMENDATION

the stocks Youngquist sold in 1996. A taxpayer cannot rely upon his own uncorroborated testimony to establish basis. *See, Coloman*, 540 F.2d at 430-32.

In any event, the standard for proving cost basis is to establish the cost of the property at issue. See 26 U.S.C. § 1012. Here, Youngquist's burden is to establish his cost basis in the specific stocks he sold in 1996. His burden is not to establish the beginning and ending balance of a trading account, nor is it to submit some evidence of a withdrawal and deposit made on a bank account tenuously related to his stock transactions. For the twenty stock sale transactions in 1996 attributed to his Protrade brokerage account, Youngquist fails to provide any evidence to substantiate his cost basis in the stock sold. There is no evidence of the dates he purchased stock, what stock he purchased, and most importantly what amounts he paid for the stocks he ultimately sold. This lack of evidence is fatal to Youngquist's case.

Youngquist argues that this matter must proceed to trial because his credibility is a crucial factor that must be assessed when determining his cost basis. However, for purposes of this summary judgment motion, I accept Youngquist's testimony as true insofar as it goes. I accept as true his testimony regarding his bank deposits and withdrawals. I accept as true that he deposited the money in a Protrade account and withdrew the money from Protrade. But this record continues to lack evidence, even in the form of Youngquist's testimony, of Youngquist's cost basis in particular stock. If Youngquist were able to testify from memory regarding the specifics of each transaction, he might be able to create a triable issue of fact. *See, e.g. Bilyeu v. CIR*, (taxpayer testified at trial from memory as to specific stock purchases). But this he fails to do. There is simply no evidence of Youngquist's cost basis in any stock sale reported by Protrade. For this reason, summary judgment should be granted in favor of the United States.

Ultimately, we have a failure by Youngquist to maintain his Protrade records and a failure to file a timely tax return. This 1996 tax liability is being litigated in 2013. "It is not the task of this or any court to restructure a taxpayer's dealings, in lieu of his facing a prescribed burden of proof, in order justify his entitlement to some tax benefit." *Better Beverages, Inc. v. U.S.*, 619 F.2d 424, 430 (1980). "[W]hen a taxpayer has failed to arrange his affairs so as to minimize his taxes, he cannot expect the court to do it for him nunc pro tunc." *Balthrope v. Comm'r*, 356 F.2d 28, 34 (5th Cir. 1966). A taxpayer's self-serving declaration is generally not a sufficient substitute for records. *Weiss v. Comm'r*, T.C. Memo.1999-17.

## III. Foreclosure

Under 26 U.S.C. § 7403, once it is established that the United States has liens upon certain property, the United States may foreclose those liens, sell the property, and apply the proceeds toward the tax liens at issue. *See United States v. Rodgers*, 461 U.S. 677, 693-94 (1983). Thus, the United States is entitled to the relief it seeks in this action if there are valid tax liens against the subject property in Benton County, and if Mr. Youngquist has an interest in the Benton County property. Youngquist does not dispute these issues.

## CONCLUSION

For the foregoing reasons, the United States's motion for summary judgment (#57) should be granted, and Youngquist's motion to strike (#61) should be denied. Should these Findings and Recommendations be adopted, the United States should file a declaration to update the tax assessment figures to reflect an abatement of $601,612.50 as detailed above, and to update all assessment figures as of the date of judgment. Following an update of tax assessment figures to reflect the abatement discussed herein, a final judgment should be entered.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 17th day of April, 2013.

*/s/ Paul Papak*
Honorable Paul Papak
United States Magistrate Judge